# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ROBYN MUNDY,                                     Case No. 1:11-cv-834
    Plaintiff,                              Dlott, J.
                                                 Litkovitz, M.J.
    vs.

COMMISSIONER OF                                  **REPORT AND**
SOCIAL SECURITY,                                 **RECOMMENDATION**
    Defendant.

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for disability insurance benefits (DIB). This matter is before the Court on plaintiff's Statement of

Errors (Doc. 13), the Commissioner's response in opposition (Doc. 14), and plaintiff's reply

memorandum. (Doc. 19).

## I. Procedural Background

Plaintiff filed an application for DIB in March 2007, alleging disability since November

1, 2004, due to osteoarthritis in her knee, shoulder, back, hip, and neck. Plaintiff's application

was denied initially and upon reconsideration. Plaintiff, through counsel, requested and was

granted a de novo hearing before administrative law judge (ALJ) Christopher B. McNeil.

Plaintiff and a vocational expert (VE) appeared and testified at the ALJ hearing. On November

19, 2009, the ALJ issued a partially favorable decision finding that plaintiff was disabled as of

April 23, 2009. Plaintiff's request for review by the Appeals Council was denied, making the

decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a) (4)(i)-(v), 404.1520(b)-(g)).  The claimant has the burden of proof at the first four steps of the sequential evaluation process.  *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir.

2

2004). Once the claimant establishes a prima facie case by showing an inability to perform the

relevant previous employment, the burden shifts to the Commissioner to show that the claimant

can perform other substantial gainful employment and that such employment exists in the

national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir.

1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2009.

2. The [plaintiff] has engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571 *et seq.*).

3. Since the alleged onset date of disability, November 1, 2004, the [plaintiff] has had the following severe impairments: degenerative joint disease and degenerative disc disease. Beginning on the established onset date of disability, April 23, 2009, the [plaintiff] has had the following severe impairments: degenerative joint disease and degenerative disc disease (20 CFR 404.1520(c)).

4. Prior to April 23, 2009, the date the [plaintiff] became disabled, the [plaintiff] did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that prior to April 23, 2009, the date the [plaintiff] became disabled, the [plaintiff] had the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b). Specifically, the [plaintiff] could perform the requirements of work activity except as follows: she could lift or carry (or both) no more than 20 pounds occasionally and 10 pounds frequently, and she could stand, sit, or walk for a total of 6 hours each, in an 8-hour workday. The [plaintiff] could only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs, she could only occasionally reach overhead with her right hand, and she could not climb ladders, ropes or scaffolds or work around heavy dust, fumes and odors.

3

6. Prior to the established disability onset date, the [plaintiff] was a younger individual age 18-49 (20 CFR 404.1563).

7. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

8. Prior to April 23, 2009, transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled", whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Prior to April 23, 2009, considering the [plaintiff]'s age, education, work experience,[1] and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the [plaintiff] could have performed (20 CFR 404.1569 and 404.1569a).

10. Beginning on April 23, 2009, the severity of the [plaintiff]'s impairments has met the criteria of section 1.04 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 404.1525).

11. The [plaintiff] was not disabled prior to April 23, 2009 (20 CFR 404.1520(g)), but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(d)).

(Tr. 16-27).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*,

478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

---

[1]Plaintiff has past relevant work as a cleaning person, office clerk, sales clerk, and office assistant.

4

402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545–46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Errors

On appeal, plaintiff argues that: (1) the ALJ erred in finding plaintiff did not meet/equal Listing 1.04 prior to April 23, 2009; (2) the ALJ erred in determining plaintiff's RFC prior to April 23, 2009; and (3) the ALJ erred by not finding plaintiff's depression and fibromyalgia were severe impairments.

1. The ALJ did not err in finding that plaintiff did not meet/equal Listing 1.04 prior to April 23, 2009.

The ALJ determined that plaintiff's degenerative joint disease and degenerative disc

disease did not meet or equal Listings 1.02, 1.03, or 1.04 prior to April 23, 2009. (Tr. 20-21).

Plaintiff contends the ALJ erred by finding that she did not meet or equal Listing 1.04 because

the medical record establishes that plaintiff met the Listing from 2006.[2] Plaintiff further argues

that the ALJ's explanation for finding that she met the listing as of, but not prior to, April 23,

2009, is vague and cursory and is not substantially supported by the record evidence. Plaintiff's

arguments are not well-taken.

Listing 1.04 covers disorders of the spine, including degenerative disc disease. The

Listing provides that in order to meet a listing, the spinal condition "must result in compromise

of a nerve root . . . or the spinal cord." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04.

Additionally, there must be:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

---

[2] In her Statement of Errors, plaintiff asserts she met Listing 1.04 "from the 2006 alleged onset date through the date of the hearing." (Doc. 13 at 6). In her letter to the Appeals Council, plaintiff amended her alleged onset date to September 1, 2006. (Tr. 201). Therefore, the resolution of plaintiff's first assignment of error is similarly limited to the period of September 1, 2006 to April 23, 2009, the date from which the ALJ determined plaintiff met Listing 1.04.

*Id.*

A summary of the record medical evidence regarding plaintiff's degenerative disc disease includes treatment notes from her primary care physician, Sharon Sax, M.D., who treated plaintiff since at least 1996. (Tr. 207-33). Dr. Sax's notes show treatment for, *inter alia*, right knee, right shoulder and neck pain, decreased range of motion, multiple trigger points, limited motion of the right shoulder, and crepitus of the knees. (Tr. 234-305, 590-664). On May 5, 2009, Dr. Sax completed a functional capacity questionnaire in which she stated that plaintiff: has sustained muscle weakness in the hands, fingers, and arms, accompanied by sensory loss; has lost the ability to grasp, turn or twist objects, use her fingers for fine manipulation, and use her arms to reach overhead; and is functionally limited due to degenerative disc disease which prevents her from carrying any weight and only rarely turn her head up, down, to the left, or to the right. (Tr. 733-37).

Plaintiff began treating with Set Shahbabian, M.D., in May 2007 for evaluation of neck pain and bilateral arm discomfort. (Tr. 551-52). Her history reveals an anterior cervical discectomy and fusion surgery at C4-5 in the early 1990's. (Tr. 551). Plaintiff also reported that in September 2006, she re-injured her neck. *Id.* Examination showed that plaintiff's gait was essentially limping, favoring the left leg; deep tendon reflexes are symmetrical and normal at knee jerks bilaterally; ankle jerk on the left side is 1-2+ and the right side is 2+; and straight raising of the leg is strongly positive in the left side in about 60 degrees. In the upper extremities, deep tendon reflexes are symmetrical and normal and hyperextension of the neck produces some tingling in the arms. Dr. Shahbabian ordered an MRI. (Tr. 552).

The May 2007 MRI of the cervical spine taken showed moderate left facet hypertrophy and mild diffuse disc bulge with mild ventral thecal sac flattening. At the C5-6 level, there was right greater than left facet hypertrophy and moderate diffuse disc bulge with ventral thecal sac flattening. Mild bilateral C6 foraminal narrowing was noted. At the C6-7 level, there was mild disc bulge and uncovertebral hypertrophy, left greater than right, with minimal narrowing of the left C7 neural foramen. The MRI of the lumbar spine showed minimal degenerative disc changes and facet arthropathy at L4-5. (Tr. 565-68).

On June 18, 2007, Dr. Shahbabian recommended anterior cervical discectomy and fusion at C5-6 and C6-7. He also reviewed the MRI of the lumbar spine which demonstrated "significant osteoarthritis and facet syndrome, especially in L4-L5. L3-L4 is starting also and L5-S1 is not that great either. There is no neural compartment compression but there is instability developing there. Sooner or later, she will end up needing posterolateral fusion and internal stabilization in the lumbar spine but this is not an emergency right now but this is progressing." (Tr. 549-50).

Consultative physician, Jennifer Wischer Bailey, M.D., examined plaintiff for disability purposes in June 2007. (Tr. 403-11). Dr. Bailey found plaintiff ambulated with a normal gait and was comfortable both in the sitting and standing positions. While there was tenderness noted on palpation of both the cervical spine and right shoulder capsule, the cervical portion of the spine allowed about 50 degrees of flexion, 80 degrees of rotation bilaterally, and 45 degrees of lateral flexion bilaterally, all within normal limits. (Tr. 408). Examination also showed slight diminishment of right-side abduction; forward flexion of the extended arms and abduction of the extended arms in a sideways arc in the coronal plane of the body were normal; muscle and grasp

strength were well preserved over the upper extremities, as were pinprick and light touch, along with bilateral manipulative ability. *Id*. Dr. Bailey found no evidence of muscle atrophy, brisk bicep and triceps reflexes bilaterally, normal flexion of elbows, and normal dorsal flexion of both wrists. *Id*. There was no evidence of paravertebral spasm, no tenderness on percussion of the lumbar spine and hips and no difficulty bending at the waist to 90 degrees. She found plaintiff could stand on either leg and ambulate heel-to-toe without difficulty. Plaintiff was able to perform straight leg raising to 90 degrees bilaterally, lateral motion of the spine was normal to 30 degrees bilaterally, there was normal range of bilateral flexion of the hips with the knees flexed (to 100 degrees), and there was no evidence of muscle weakness or atrophy. There was slightly diminished flexion of the knees (to 140 degrees bilaterally, with extension normal to 0 degrees bilaterally). There also was mild crepitus to passive range of motion of both knees, but with no evidence of effusion or synovial thickening. Ankle joints showed normal plantar and dorsal flexion. (Tr. 409). Dr. Bailey also obtained an x-ray that day which showed the soft tissues about the hip were normal; there were no articular alterations, fractures, dislocations, or destructive lesions; and the acetabular fossa appeared normal. (Tr. 441). Based on the findings of this examination, Dr. Bailey concluded that plaintiff "appears capable of performing at least a moderate amount of sitting, ambulating, standing, bending, pushing, pulling, lifting and carrying heavy objects. She would probably complain of pain with repetitive kneeling. In addition, [plaintiff] has no difficulty reaching, grasping, and handling objects. There are no visual and/or communication limitations nor are there environmental limitations." (Tr. 410).

State agency physician, Elizabeth Das, M.D., reviewed the file on July 14, 2007

and completed a physical residual functional capacity assessment. (Tr. 412-19). She opined that plaintiff could lift and/or carry and push and/or pull no more than 20 pounds occasionally and 10 pounds frequently; could stand and/or walk about six hours in an eight-hour workday; and could sit for about six hours in an eight-hour workday. (Tr. 413). Dr. Das also found that plaintiff could only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs; she could only occasionally reach overhead with her right hand; and she could not climb ladders, ropes or scaffolds or work around heavy dust, fumes and odors. (Tr. 414-16). Dr. Das deemed plaintiff's allegations "partially credible." (Tr. 417). State agency physician Michael Stock, M.D., affirmed Dr. Das' assessment in February 2008. (Tr. 526).

Dr. Shahbabian performed fusion surgery at C5-6 and C6-7 on January 4, 2008. (Tr. 529-32). In September 2008, plaintiff reported her neck was "okay" but that she was still having low back pain. Of concern to Dr. Shahbabian was that "even though she states her neck is fine, she keeps falling because her left leg is suddenly giving out." Dr. Shahbabian found positive straight leg raising and recommended an MRI. (Tr. 545). The MRI of the lumbar spine taken on October 13, 2008 showed disc desiccation and minimal disc bulge with a slightly more focal small central left disc protrusion with a tiny annular tear at the L4-5 level. There was no evidence of neural compression or foraminal narrowing. There was mild bilateral facet arthrosis with no evidence of canal stenosis. (Tr. 563-64).

Plaintiff was seen by Todd M. Kravetz, M.D., of Dr. Sax's practice, on April 23, 2009, because plaintiff fell down the stairs and had neck pain. (Tr. 727-29). To assess her neck sprain and strain, Dr. Kravetz ordered an MRI of plaintiff's cervical spine. *Id.* The MRI of the cervical spine taken on April 25, 2009, revealed moderate to severe narrowing of the left neural foramen,

10

multilevel facet degeneration, and left paracentral disc protrusion at C6-7, indenting the left side of the thecal sac. (Tr. 561-62).

In June 2009, plaintiff reported to Dr. Shahbabian that she fell and sustained another injury to her neck in March 2009. (Tr. 544). Dr. Shahbabian advised physical therapy, but plaintiff was unable to attend due to transportation difficulty but noted she did have access to a pool. *Id.* Dr. Shahbabian noted there was nothing surgical he should do. *Id.*

In determining that plaintiff did not meet Listing 1.04 until April 23, 2009, the ALJ stated:

> [r]egarding listing 1.04 (disorders of the spine), while there was a diagnosis of multilevel degenerative disease in the cervical spine, this was treated first in 1993 with the fusion of the C4-5 spine [Tr. 549, 551], followed by a course of conservative treatment that did not disclose evidence of nerve-root compression and motor loss. [Tr. 341-52]. A second fusion of the cervical spine, affecting the C5-6, was performed in January 2008, after which [plaintiff]'s treating physician determined the cervical spine to be very stable, with minimal neural compression, if any [Tr. 544]. And while minimal anterior osteophyte formation in the lumbar spine was detected in 2007 [Tr. 341], there was no acute abnormality found (*id.*). Therefore, the [plaintiff] did not meet the listing (which is only met upon a showing of neuron-anatomic distribution of pain, limitation of motion of the spine, and motor loss, accompanied by sensory or reflex loss).

(Tr. 20).

Plaintiff argues that the above evidence, specifically the 2007 MRI showing degenerative disc disease significant enough to warrant surgery a few months later (Tr. 549, 559), supports a finding that plaintiff was disabled as of the alleged disability onset date. Plaintiff claims that she met the criteria of Listing 1.04(A) prior to 2008 given the evidence of pain (Tr. 447, 551); limitation of motion (549, 551); motor loss (Tr. 449, 549); and sensory/reflex loss. (Tr. 547, 549, 551). While plaintiff rightly identifies that the medical evidence supports a finding that she exhibited the symptoms identified by Listing 1.04, her argument fails to acknowledge the

11

prerequisite for meeting the Listing: her degenerative disc disease "must result in compromise of a nerve root . . . or the spinal cord" *as well as* the above-cited symptoms. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04.

The ALJ cited to the objective findings of record and determined that plaintiff's medical records did not evidence nerve-root compression prior to April 2009. *See* Tr. 20, citing Tr. 341-52, 544, 549, 551. After addressing this evidence, the ALJ found that it did not support a finding that plaintiff's degenerative disc disease met or equaled Listing 1.04 until April 2009, when an MRI found moderate to severe neural foramen narrowing which was noted as a new finding. (Tr. 561-62). Plaintiff argues that this MRI is not significantly different from the 2007 MRI (Tr. 565-66), after which plaintiff required fusion surgery, and that the ALJ erred by not finding that she met Listing 1.04 from at least that date. (Doc. 19 at 2). A review of the MRIs reveals, as noted above, that the 2009 MRI contained a "new" finding of severe neural foramen narrowing (Tr. 561-62) which was not present in the May 2007 MRI, which found only mild to minimal neural foramen narrowing. (Tr. 565). The difference between mild or moderate and severe narrowing is significant and supports the ALJ's determination that plaintiff did not meet Listing 1.04 until objective evidence of record established that she had "nerve root compression characterized by neuron-anatomic distribution of pain, limitation of motion of the spine, and muscle weakness accompanied by sensory loss." (Tr. 19). The ALJ's decision reflects that he thoroughly considered and discussed plaintiff's objective and subjective evidence in finding that she did not meet Listing 1.04 until April 23, 2009. Accordingly, plaintiff's first assignment of error should be overruled.

2. <u>The ALJ erred in formulating plaintiff's pre-April 23, 2009 RFC by not properly considering the scope of her treating physician's opinion.</u>

For her second assignment of error, plaintiff argues the ALJ erred in formulating her RFC from her alleged disability onset date to April 23, 2009. Plaintiff contends that the ALJ mischaracterized the RFC opinion of her treating physician, Dr. Sax, by stating that it applied from May 5, 2009 onward, *see* Tr. 23, 26-27, while Dr. Sax opined that plaintiff's impairments had existed and progressed for twelve months preceding the date of the RFC opinion. *See* Tr. 734. Plaintiff also argues that the ALJ erred by not addressing Dr. Shahbabian's comments regarding her disability and by failing to find any limitations on plaintiff's ability to use her hands for fine and gross manipulation despite supporting evidence. For the following reasons, the undersigned finds that the ALJ erred in his analysis of Dr. Sax's opinion.

"In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Sec'y of H.H.S.,* 708 F.2d 1048, 1054 (6th Cir. 1983). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(c)[3]; *Harris*, 756 F.2d 431 (6th Cir. 1985). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

13

inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2); *see also Walters*, 127 F.3d at 530. If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Sec'y of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). The opinion of a nonexamining physician is entitled to little weight if it is contrary to the opinion of the claimant's treating physicians. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). If the ALJ rejects a treating physician's opinion, the ALJ's decision must be supported by a sufficient basis which is set forth in his decision. *Walters*, 127 F.3d at 529; *Shelman*, 821 F.2d at 321.

If the ALJ does not give the treating source's opinion controlling weight, then the ALJ must consider a number of factors when deciding what weight to give the treating source's opinion. 20 C.F.R. § 404.1527(c). These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(c)(2)(i)(ii); *Wilson,* 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(3)-(6); *Wilson,* 378 F.3d at 544. The ALJ must likewise apply the factors set forth in § 404.1527(c)(3)-(6) when considering the weight to give a medical opinion rendered by a non-treating source. 20 C.F.R. § 404.1527(c). When considering the medical specialty of a source, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a

---

[3] Regulation 20 C.F.R. § 404.1527 was amended effective March 26, 2012. The provision governing the weight to be afforded a medical opinion was previously found at § 404.1527(d).

specialist." 20 C.F.R. §§404.1527(c)(5).

In this case, the ALJ gave great weight to Dr. Sax's opinion as it "is based on a complete

longitudinal record of medical evidence, including objective testing conducted in 2009, revealing

advanced degenerative disc disease." (Tr. 27). In formulating plaintiff's RFC for the closed

period of her alleged onset date to April 23, 2009, the ALJ stated that Dr. Sax's RFC assessment

permitted less than sedentary work as of May 5, 2009, the date the report was written. (Tr. 23).

The ALJ further stated that, "[p]rior to this time, none of the [plaintiff]'s treating physicians

concluded the [plaintiff]'s ability to work was restricted in the manner claimed by the [plaintiff]."

*Id.* The undersigned finds that the ALJ's determination that Dr. Sax's RFC opinion applied only

to the time period of May 5, 2009, onward is not substantially supported by the evidence of

record.

Dr. Sax completed an RFC assessment on May 5, 2009, in which she opined that

plaintiff's impairments, including fibromyalgia and coexistent depression, cause plaintiff to be

incapable of even "low stress" jobs as plaintiff is unable to concentrate due to her pain. (Tr.

734). Dr. Sax further opined that plaintiff was unable to walk a block without rest or severe pain;

was able to sit for only 20 minutes at a time and for about four hours in an eight-hour work day;

was able to stand for only 15 minutes at a time and for less than two hours in an eight-hour

workday and needed to walk for five minutes approximately every 15 minutes; needed to take

unscheduled breaks three times an hour during an eight-hour workday; could never lift and carry

any weight; could rarely look down, up, or turn her head left or right; could never twist, stoop,

crouch, squat, or climb ladders but could occasionally climb stairs; and had significant

limitations in reaching, handling, or fingering such that she could not grasp, turn or twist objects,

use her fingers for fine manipulation, or use her arms to reach overhead. (Tr. 735-37). When asked if plaintiff's impairments lasted or can be expected to last at least twelve months, Dr. Sax checked the "No" box and included a handwritten notation, "They *have* lasted and progressed." (Tr. 734) (emphasis added).

The undersigned finds that Dr. Sax's notation that plaintiff's impairments "have lasted and progressed" for at least twelve months indicates that Dr. Sax intended her opinion to apply retroactively for the twelve months preceding May 5, 2009. The ALJ's statements that Dr. Sax's opinion was limited to the time from May 5, 2009 forward and that no treating physician suggested limitations as alleged by plaintiff prior to May 5, 2009 are contrary to the plain reading of Dr. Sax's RFC assessment. Accordingly, to the extent that the ALJ's RFC formulation does not account for the limitations imposed by Dr. Sax for the twelve months preceding May 5, 2009, the RFC is not supported by substantial evidence. The undersigned recommends that this matter be reversed and remanded with instructions to the ALJ to reconsider Dr. Sax's opinion on plaintiff's RFC assessment and the onset date of disability.

Lastly, plaintiff argues that the ALJ erred by failing to discuss Dr. Shahbabian's opinions regarding the effect of her spinal impairments on her capacity for employment. On June 18, 2007, plaintiff saw Dr. Shahbabian for re-examination and Dr. Shahbabian opined that due to a "traction spur in the right side in C5-C6 and in the left side in C6-C7 with neural compression[,]" plaintiff will need "anterior cervical discectomy and fusion in the level of C5-C6 and C6-C7 with bone graft taken from the left iliac crest." (Tr. 549). Dr. Shahbabian further stated that plaintiff "has a shoulder problem and a knee problem and that is not going to help her recovery. I won't rush the lumbar spine but sooner or later, she will need surgery." *Id.* Plaintiff was informed that

16

"by the time she is scheduled and operated on the cervical spine and recovers from that surgery" the lumbar spine would then be addressed. (Tr. 550). Dr. Shahbabian opined that plaintiff should expect a recovery time of approximately one year following spinal surgery during which plaintiff would "be unable to be involved in gainful employment." (Tr. 550). As noted above, plaintiff underwent fusion surgery at C5-6 and C6-7 in January 2008 (Tr. 529-32) and reported ongoing back pain 8 months later. (Tr. 545).

In his decision, the ALJ did not address Dr. Shahbabian's June 18, 2007 opinion that plaintiff would be unable to engage in gainful employment post-back surgery as she would be in recovery for "possibly a one year period." *See* Tr. 550. When an ALJ fails to mention relevant evidence in his decision "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Morris v. Sec'y of H.H.S.*, No. 86–5875, 1988 WL 34109, at * 2 (6th Cir. Apr. 18, 1988) (quoting *Cotter v. Harris,* 642 F.2d 700, 705 (3d Cir. 1981)). The ALJ's opinion makes no mention of Dr. Shahbabian's opinion that plaintiff would be precluded from work for one year while she recovered from back surgery. Given the ALJ's silence, the Court cannot discern from the instant record whether the ALJ overlooked, ignored, or rejected this evidence. As a result of this omission, the ALJ committed an error law when he failed to comply with his duty to weigh Dr. Shababian's opinion in accordance with 20 C.F.R. § 404.1527(c). Because the ALJ provided no explanation for not addressing these records, which support a finding that plaintiff was precluded from work for at least one year following her January 2008 cervical spine surgery, remand is required to allow the ALJ to fully consider these records. *See Bowen*, 478 F.3d at 750.

3. The ALJ did not err by finding that plaintiff's depression was not a severe impairment, but erred in failing to address the evidence of plaintiff's fibromyalgia.

For her final assignment of error, plaintiff argues that the ALJ erred by finding that her depression and fibromyalgia were not severe impairments. In support, plaintiff notes the longitude of history of treatment for fibromyalgia as well as her reports that she has "dealt with depression for a long time." (Doc. 13 at 13, citing Tr. 381). For the following reasons, the undersigned finds that the ALJ did not err in finding plaintiff's depression to be a non-severe impairment but erred in not addressing the evidence of plaintiff's fibromyalgia.

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). In the physical context, this means a significant limitation upon a plaintiff's ability to walk, stand, sit, lift, push, pull, reach, carry or handle. *See* 20 C.F.R. § 404.1521(b)(1). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. § 404.1521(b).

Plaintiff is not required to establish total disability at this level of the sequential evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Sec'y of H.H.S.,* 736 F.2d 352, 357 (6th Cir. 1984). An impairment will be considered nonsevere only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Sec'y of H.H.S.,* 773 F.2d 85, 90 (6th Cir. 1985) (citing *Brady v.*

*Heckler,* 724 F.2d 914, 920 (11th Cir. 1984)). The severity requirement is a *"de minimis* hurdle"

in the sequential evaluation process. *Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir. 1988). *See*

*also Rogers,* 486 F.3d at 243 n.2.

In support of her argument that her depression is a severe impairment, plaintiff relies

exclusively on the report of consultative examining psychiatrist, Kevin W. Eggerman, M.D., and

a notation from Dr. Sax's RFC assessment that plaintiff has "co-existent depression" and

"anxiety/panic attacks." (Doc. 13 at 13, citing Tr. 381-86, 734). Specifically, plaintiff cites to

the following evidence: (1) her subjective report to Dr. Eggerman that she had "dealt with

depression for a long time" (Tr. 381); (2) Dr. Eggerman's notations that plaintiff had limited

insight and was defensive, guarded, anxious, and irritable (384-85); (3) Dr. Eggerman's diagnosis

that plaintiff had depressive disorder, not otherwise specified, and assigned a Global Assessment

of Functioning (GAF) [4] score of 60, indicating symptoms of moderate severity (Tr. 385); (4) Dr.

Sax's opinion that plaintiff suffers from depression and anxiety attacks (Tr. 734); (5) the fact that

plaintiff was prescribed Prozac, Cymbalta, and Zanaflex for depression (Tr. 423, 596); and (6)

Dr. Sax's opinion that plaintiff is incapable of even a low stress job due to her inability to

concentrate. (Tr. 734). Plaintiff contends that this evidence, particularly the GAF score of 60

suggesting that she suffers from moderate limitations due to depression, supports a finding that

her depression is a severe impairment contrary to the ALJ's finding. The undersigned disagrees.

---

[4] GAF is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Martin v. Comm'r,* 61 F. App'x 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision ("DSM–IV–TR") at 32–34. A GAF score of 60 indicates moderate symptoms (*e.g.,* flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.,* few friends, conflicts with peers or co-workers). DSM-IV-TR at 34.

19

In determining that plaintiff's depression was nonsevere, the ALJ noted that she has not and is not receiving therapy for any mental impairment (Tr. 20, citing Tr. 151, Report of Contact in which plaintiff reported that she is "not currently seeing anyone for mental health treatment at this time [and h]as no past psychiatric hospitalizations."). Further, the ALJ correctly identified that the record does not contain any objective evidence from a mental health provider supporting a finding of severe depression. *Id.* The ALJ also noted that the report from consultative examining psychiatrist Dr. Eggerman included findings of only mild symptoms and that this opinion was affirmed by subsequent psychiatric functional capacity evaluation. *Id.*, citing Tr. 380-86 (Dr. Eggerman's Report); Tr. 389-402 (Psychiatric Review Technique completed by state agency reviewing psychologist Leslie Rudy, Ph.D. finding only mild limitations resulting from plaintiff's depression).

Here, the record evidence demonstrates that plaintiff's depression results in only mild or minimal effects on her functional capabilities. Dr. Eggerman, the only mental health specialist of record who examined plaintiff, found that plaintiff was not limited in her ability to understand and remember or carry out short and simple instructions; was mildly limited in her ability to understand and remember and carry out detailed instructions; and was minimally limited in her ability to make judgments on simple work-related decisions. (Tr. 386). Further, the only other opinion from a mental health specialist came from Dr. Rudy who opined that plaintiff had only mild limitations due to her depression. (Tr. 399). Although plaintiff's primary physician, Dr. Sax, who is not a mental health specialist, diagnosed plaintiff with depression, she did not provide any opinion as to how plaintiff's depression limited her. *See Foster v. Bowen,* 853 F.2d 483, 488-89 (6th Cir. 1988) (relevant consideration in disability case is not claimant's diagnoses,

20

but functional limitations caused by impairments). This diagnosis, without more, does not establish that plaintiff's depression results in severe limitations. Although Dr. Sax opined that plaintiff was incapable of even low stress work due to her inability to concentrate, it is not clear that this opinion was a result of plaintiff's depression as opposed to her pain disorder. To the extent that plaintiff relies on Dr. Eggerman's GAF score of 60 to demonstrate that her depression created moderate and more than mild limitations, this argument is misplaced in light of Dr. Eggerman's clear findings that plaintiff's depression caused only mild and minimal limitations. Plaintiff's argument also ignores Dr. Eggerman's notations that the GAF of 60 was largely assigned because of plaintiff's pain symptoms and occupational problems as opposed to her depression. *See* Tr. 386. Moreover, a GAF score of 60, taken alone, is insufficient to establish a severe impairment. The Commissioner has "declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006) (quoting *Wind v. Barnhart*, 133 F. App'x 684, 691-92 n.5 (11th Cir. 2005)) (quoting 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)). *See also Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) ("[A]ccording to the [Diagnostic and Statistical Manual's] explanation of the GAF scale, a score may have little or no bearing on the subject's social and occupational functioning.... [W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place.") (citing *Howard v. Comm'r of Soc Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)). The ALJ reasonably gave more weight to the medical opinions of the consultative examining and non-examining reviewing mental health specialists of record as to plaintiff's impairments and

21

limitations. The Court thus concludes that the ALJ did not err in finding that plaintiff's depression was not a severe impairment.

Plaintiff further argues the ALJ erred by failing to find that her fibromyalgia was a severe impairment. Plaintiff contends that her long history of fibromyalgia, documented complaints of fibromyalgia-associated pain, objective findings of limited motion and trigger points, physical therapy and medication-based treatment, and Dr. Sax's opinion that her fibromyalgia has been progressively incapacitating support a finding that this condition is severe. The Court agrees.

The ALJ's decision states that plaintiff's fibromyalgia is a nonsevere impairment. (Tr. 19). However, the ALJ's decision lacks any meaningful discussion of the evidence of plaintiff's fibromyalgia showing this impairment had no more than a "minimal effect" on her ability to work.

The evidence shows that plaintiff had a history of treatment for fibromyalgia with Dr. Burtke, a rheumatologist, prior to commencing treatment at the Deaconess Arthritis Center in August 2004. (Tr. 249, 421-38, 573-89). When initially seen, rheumatologist Hana Badreddine, M.D., noted plaintiff's complaints of pain all over, including her hands, elbows, shoulders, hips, knees, ankles, feet, lower back, and neck. (Tr. 431). Dr. Badreddine observed shoulder discomfort on movement and palpation, crepitus in both knees, positive bulge sign in the right knee, puffiness in the hands, and fibromyalgia tender points in the knee and greater trochanteric area. (Tr. 432). Plaintiff was assessed with a history of fibromyalgia of six years duration, osteoarthritis of the knees, and right shoulder pain related to a rotator cuff tear repair. (Tr. 431-35). Dr. Badreddine prescribed Mobic and recommended aquatic therapy. *Id.*

22

In March 2007, plaintiff reported worsening symptoms in her hands, shoulders, and hip. Examination revealed limited motion and positive trigger points in the neck, costochondral junction, greater trochanteric area, gluteal area, and knees. (Tr. 429). Dr. Badreddine noted that fibromyalgia was "still there" and increased Cymbalta and prescribed Daypro and Norflex. *Id.* On examination in September 2007, plaintiff was still experiencing limitations in range of motion due to pain in the mid-cervical spine area, right lateral rotation was limited to 40 degrees with mild discomfort, and bending was limited to 20 degrees bilaterally. Examination also showed osteoarthritis of the knees, fibromyalgia, and a mild Heberden node in the right second distal interphalangeal joint, but motor strength was adequate in the major muscle groups of both the upper and lower extremities. (Tr. 421-22).

In May 2008, Dr. Badreddine examined plaintiff and noted "[t]ender points for fibromyalgia were positive and included neck, second costochondral junction, and greater trochanteric region. Her hands were puffy. There was discomfort also on range of motion of the neck." (Tr. 589). In September 2008, examination demonstrated "all the fibromyalgia points were tender." (Tr. 583).

In addition, Dr. Sax opined that plaintiff's fibromyalgia has been progressively incapacitating. (Tr. 733). *See also* Tr. 594 (Dr. Sax's notes showing "tender over hands" and still treating with Dr. Badreddine); Tr. 596 (noting "100% + triggers" and fibromyalgia).

Despite this evidence, the ALJ made no determination as to how plaintiff's fibromyalgia impacted her functional abilities. Given the ample objective and clinical evidence of plaintiff's fibromyalgia, as well as Dr. Sax's opinion that plaintiff's fibromyalgia was incapacitating, the ALJ erred by finding plaintiff's fibromyalgia is nonsevere without addressing this evidence. In

23

the absence of any meaningful discussion of the evidence of plaintiff's fibromyalgia and its effects on plaintiff's RFC, the undersigned concludes the ALJ's severity decision on plaintiff's fibromyalgia is not substantially supported by the record. Accordingly, the ALJ's decision should be remanded with instructions to the ALJ to consider the effect of plaintiff's fibromyalgia on her RFC.

**III. This matter should be reversed and remanded for further proceedings.**

This matter should be reversed and remanded pursuant to Sentence Four of § 405(g) for further proceedings consistent with this Report & Recommendation. All essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of her amended onset date of September 1, 2006. *Faucher*, 17 F.3d at 176. On remand, the ALJ should: (1) reformulate plaintiff's RFC and re-evaluate the onset date of plaintiff's disabling impairments in light of Dr. Sax's opinion that plaintiff's impairments were disabling for twelve months preceding May 5, 2009; (2) weigh Dr. Shahbabian's June 2007 opinion that plaintiff would be unable to work for one year after her back surgery in accordance with 20 C.F.R. § 404.1527; and (3) evaluate the evidence pertaining to plaintiff's fibromyalgia and account for any limitations imposed by fibromyalgia in formulating plaintiff's RFC.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: 2/4/13

Karen L. Litkovitz
United States Magistrate Judge

24

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

ROBYN MUNDY,
     Plaintiff

     vs.

COMMISSIONER OF
SOCIAL SECURITY,
     Defendant

Case No. 1:11-cv-834
Dlott, J.
Litkovitz, M.J.

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).

25